# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>v.<br><br>Taariq Kaaleeq Jackson-Bey,<br><br>            Defendant. | Case No. 17-cr-152 (JNE/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Benjamin Bejar, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for United States of America

James Becker, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415, for Defendant Taariq Kaaleeq Jackson-Bey

HILDY BOWBEER, United States Magistrate Judge

This matter came before the undersigned United States Magistrate Judge for a pretrial motions hearing on February 9, 2017.  (Min. Entry Mot.'s Hr'g [Doc. No. 38].)  The case was referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a)(3)(A).  This Court ruled on Defendant Taariq Kaaleeq Jackson-Bey's nondispositive motions in its February 16, 2018 Order [Doc. No. 45].  On March 7, 2018, following post-hearing briefing by the parties, the Court took under advisement Jackson-Bey's Motion to Suppress evidence obtained during traffic stops occurring on January 4, 2017 and April 13, 2017 [Doc. No. 35].  For the

reasons set forth below, the Court recommends that the Motion to Suppress be denied.

## I.    Procedural Background

On June 22, 2017, Defendant Taariq Kaaleeq Jackson-Bey ("Jackson-Bey") was charged with two counts of Felon in Possession of a Firearm and one count of Felon in Possession of Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). (Indictment [Doc. No. 1].)  At his June 29, 2017 arraignment, Jackson-Bey entered a plea of not guilty.  (Arraignment Order [Doc. No. 13].)  A short time later, on August 16, 2017, Jackson-Bey moved for a psychiatric examination and requested a hearing, if necessary, to determine whether he was competent to stand trial [Doc. No. 20].  The Court granted Jackson-Bey's motion and ordered that an examination be conducted. (July 17 Order [Doc. No. 21].)  The results of that examination were submitted in a December 19, 2017, Forensic Report prepared by David M. Szyhowski, Psy.D., in which he concluded that Jackson-Bey does not suffer from any severe mental disease that impacts his ability to understand the legal proceedings or properly assist his counsel [Doc. No. 24].  Jackson-Bey opted not to request a competency hearing to dispute the report's findings.  (Jan. 5, 2018 Letter [Doc. No. 26].)

Jackson-Bey then filed eight discovery and evidence-related pre-trial motions, including the instant motion to suppress [Doc. Nos. 28-35].  The motion to suppress alleges that police officers unlawfully seized evidence during the January 4 and April 13, 2017, traffic stops in violation of his Fourth Amendment rights.  The government called Saint Paul Police Officers Charles Lemon and Daniel Gleason to testify at the evidentiary hearing.  (Min. Entry Mot.'s Hr'g [Doc. No. 38].)  Jackson-Bey introduced three exhibits

2

pertaining to the January 4, 2017, traffic stop: a map of the area where the traffic stop took place (Def.'s Ex. 1); Officer Lemon's Official Incident Report (Def.'s Ex. 2); and the dashboard camera video of the traffic stop (Def.'s Ex. 3).

## II.    Relevant Factual Background

### A.    January 4, 2017, Traffic Stop

In the early morning of January 4, 2017, police officers Charles Lemon and Laurie Ueland were patrolling downtown Saint Paul in a marked squad car near the Dorothy Day Center, with Officer Lemon at the wheel.  (Mot. Hr'g Tr. 12-14 [Doc. No. 42].)  The area is depicted in Defendant's Exhibit 1, reproduced below:



At around 2:00 a.m., while the two officers were in their squad car on St. Joseph's Lane, Officer Lemon noticed a Mercury Mountaineer SUV parked on the east side of the street facing northbound. (*Id.* at 14.) From a distance of about 150 to 200 feet, Officer Lemon observed the SUV "go into gear" and "abruptly drive forward" toward the intersection of St. Joseph's Lane and Exchange Street. (*Id.* at 14-15.) The intersection was controlled by a three-way stop sign. Officer Lemon observed the vehicle make a right-hand turn eastbound onto Exchange Street without coming to a complete stop at the stop sign prior to making the turn. (*Id.* at 15-16.) He testified this constituted a moving traffic violation, and that the road conditions at the time were clear; no snow, ice or other debris could have caused the vehicle to inadvertently slide through the stop sign. (*Id.* at 16.)

Officer Lemon drove northbound on St. Joseph's Lane toward the intersection and watched as the SUV traveled halfway up the block on Exchange Street and turned left into the easternmost entrance of the semicircular drop-off area of St. Joseph's Hospital. (*Id.* at 16-17.) He did not see the SUV drop anyone off at the hospital. (*Id.* at 18:13-14.) He did not immediately stop the SUV, however, explaining that it would have been unsafe for him to do so in the hospital drop-off area. (*Id.* at 17:22-25.). (*Id.* at 17-18.) Instead, Officer Lemon moved his squad car to a position on the north side of Ninth Street, just short of and pointing toward the intersection with Exchange Street, from which he could look toward St. Joseph's Hospital and monitor the SUV in the driveway. (*Id.* at 17:18-20.) From that position, Officer Lemon observed the SUV start to pull out from the western entrance of the semicircular driveway with the right turn signal

5

activated. (*Id.* at 18:16-18.) At that point, Officer Lemon testified, he made direct eye contact with the driver of the SUV. (*Id.* at 19:1-14; 40:9-41:3.) Officer Lemon stated that the driver began to pull forward with the right turn signal still blinking, then abandoned his apparent intention to turn right out of the hospital drop-off area and instead turned left onto Exchange Street, in the direction away from the squad car. (*Id.* at 19:1-4.) Officer Lemon testified that his line of sight to the SUV was unobstructed. (*Id.* at 19:17-19.) Based on the driver's decision to change directions after having seen the squad car, Officer Lemon believed the driver was being evasive. (*Id.* at 20:8-9) In addition, he concluded the driver had violated traffic laws by turning left without properly signaling his lefthand turn. (*Id.* at 30:8-15.)

After the SUV turned left out of the hospital driveway, Officer Lemon activated his overhead lights, turned onto Exchange Street himself, and pulled the SUV over at the intersection of Exchange Street and St. Peter Street. (*Id.* 20:11-25.) Officer Lemon testified that two moving violations underlay the traffic stop — the failure to make a complete stop at the stop sign before turning from St. Joseph's Lane onto Exchange Street, and the failure to properly signal the lefthand turn from the St. Joseph's Hospital driveway onto Exchange Street. (*Id.* at 30:8-15.)

Officer Lemon approached the driver's side of the SUV and for the first time recognized the driver as Taariq Jackson-Bey, whom he knew from several previous encounters. (Mot. Hr'g Tr. 21:5-15; Def.'s Ex. 2 at 6.) Officer Ueland approached the passenger's side of the vehicle, where Vincent Lindsey was sitting in the front passenger's seat. (*Id.* 20-21; Def.'s Ex. 2 at 6.) As Jackson-Bey rolled down the driver's

side window,  Officer Lemon smelled the odor of un-burnt marijuana emanating from inside the vehicle.  (Mot. Hr'g Tr. 21:5-15.)  Officer Lemon also observed Jackson-Bey pull a large amount of rolled-up cash from his pocket while he searched for his identification.  (Def.'s Ex. 2 at 6.)  Based on the smell of marijuana and the rolled-up cash, Officer Lemon believed criminal activity was afoot and directed Jackson-Bey to step outside the vehicle.  (*Id.*)  He then placed Jackson-Bey under arrest, searched the vehicle, and uncovered, among other things, a black .360 caliber Glock handgrun. (*Id.* at 6-8.)

On cross-examination, Officer Lemon acknowledged that he did not recall precisely how he drove from his initial position on St. Joseph's Lane to his next position on Ninth Street from which he observed Jackson-Bey's turn out of the hospital driveway. He admitted his police report states that he "circled around the block" but did not remember what he meant by that; he thought he might have executed a U-turn to get to his new position.  (*Id.* at 36:16-37:12; Def.'s Exhibit 2 at 6.)  He also acknowledged on cross-examination that there may have been some momentary windows of time when he lost sight of the SUV as he repositioned his squad car. (*Id.* at 37:13-15.)  He agreed that from his vantage point on Ninth Street, he could only see the front of the SUV and the driver as it sat in the west entrance of the driveway "poking" into the sidewalk, but insisted that he could see it, the driver, and the blinking right turn signal before it had pulled fully onto the sidewalk or into the street.  (*Id.* at 36:6-14, 38:1-20.)  He admitted, however, that he could not tell from his position on Ninth Street whether the SUV's *left*

turn signal had been activated prior to its lefthand turn from the St. Joseph's driveway onto Exchange Street. (*Id.* at 42:8-14.)

### B.    April 13, 2017, Traffic Stop

Saint Paul Police Officers Daniel Gleason and Joseph Sauer are members of the FORCE Unit, a task force directed at reducing crime in problem areas of the city with particular attention to street-level drug abuse. (Mot. Hr'g Tr. 47); Saint Paul Police Department Manual § 308.00, Focusing Our Resources on Community Empowerment (FORCE), *available at* https://www.stpaul.gov/books/30800-force-focusing-our-resources-community-empowerment (last visited Mar. 28, 2018). On the evening of April 13, 2017, Officer Gleason and his partner received a call from other officers in the FORCE Unit requesting they investigate suspected drug dealing taking place near the Dorothy Day Center. (Mot. Hr'g Tr. 48-49.) In particular, the FORCE Unit members informed Officer Gleason that they had observed Jackson-Bey making frequent short visits with various individuals and then walking back to his car—actions that caused them to suspect he was selling drugs. (*Id.*) Shortly thereafter, Officer Gleason arrived at the area and observed Jackson-Bey get into a white Chevrolet Malibu sedan at the intersection of Exchange Street and St. Joseph's Lane. (*Id.* at 49:17-22.) Officer Gleason was familiar with Jackson-Bey from multiple previous interactions, and knew he had previous felony convictions and a revoked driver's license. (*Id* at 50-51.)

After seeing Jackson-Bey enter the vehicle, Officer Gleason observed him drive off at a "high rate of speed eastbound." (*Id.* at 51:9-10.) Believing that he was speeding and driving without a license, Officer Gleason and his partner proceeded to follow

8

Jackson-Bey's vehicle to effect a traffic stop. (*Id.* at 52:3-8.) In doing so, Officer Gleason observed the vehicle make an improper left-hand turn from Exchange Street into the far lane of Wabasha Street. (*Id.* at 52:11-18.) Approximately five blocks later, Officer Gleason and his partner were able to get into position to make the traffic stop, and pulled Jackson-Bey over near the intersection of 12th Street and John Ireland Boulevard. (*Id.* at 53:5-12.) Upon inspection, Officer Gleason observed that the Chevrolet Malibu sedan did not have license plates and had expired temporary tags. (*Id.* at 53-54.) Jackson-Bey was also unable to provide proof of automobile insurance. (*Id.* at 55.) The police then searched the car, found a .380 caliber Ruger LCP handgun, and placed Jackson-Bey under arrest. (Indictment at 2.)

## III.    Motion to Suppress Search and Seizure Evidence

Jackson-Bey moves to suppress evidence obtained during the January 4 and April 13, 2017, traffic stops, including the .380 caliber Glock handgun and .380 caliber Ruger LCP handgun that underlie counts one and two of the indictment. Jackson-Bey alleges these items of evidence should be suppressed because there was not probable cause for the traffic stops, and therefore the evidence was seized in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. Jackson-Bey does not, however, argue that the vehicle searches were illegal if the traffic stops were justified. (Def.'s Mem. Supp. Mot. Suppress at 19-20 [Doc. No. 46].)

### A.    Standard of Review

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

Const. amend IV.  The stop of a motor vehicle is a "seizure" that implicates the Fourth

Amendment.  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  To be constitutionally

permissible, a traffic stop must be supported by probable cause or reasonable suspicion.

*United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013).  A police officer has

probable cause to conduct a traffic stop when "an officer objectively has a reasonable

basis for believing that the driver has breached a traffic law." *Id.* (quoting *United States v.*

*Coney*, 456 F.3d 850, 856 (8th Cir.2006)).  Any traffic violation, even if minor, provides

probable cause for a stop.  *United States v. Williams*, 429 F.3d 767, 771 (8th Cir. 2005).

For instance, operating a vehicle slightly above the speed limit gives officers probable

cause to conduct a traffic stop.  *See United States v. Neumann*, 183 F.3d 753, 756 (8th

Cir. 1999).  An officer's subjective belief or pretextual motive does not invalidate the

lawful basis for the stop.  *Williams*, 429 F.3d at 771.  Alternatively, a police officer has

reasonable suspicion to justify a stop "when the officer is aware of 'particularized,

objective facts which, taken together with rational inferences from those facts, reasonably

warrant suspicion that a crime is being committed.'"  *United States v. Houston*, 548 F.3d

1151, 1153 (8th Cir. 2008) (quoting *United States v. Martin*, 706 F.2d 263, 265 (8th

Cir.1983)).  Inarticulable hunches or generalized suspicions, on the other hand, are

insufficient to make a stop.  *Ybarra v. Illinois*, 444 U.S. 85, 92–93 (1979).

The Fourth Amendment generally requires the government to obtain a warrant

from a neutral judge prior to searching any place where an individual has a reasonable

expectation of privacy. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968) (stating "police must,

whenever practicable, obtain advance judicial approval of searches and seizures through

10

the warrant procedure"). However, under "specifically established and well-delineated exceptions," the government need not obtain a warrant prior to conducting a search. *Katz v. United States*, 389 U.S. 347, 357 (1967). Under the search incident to arrest exception, police may conduct a warrantless search of a vehicle "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009) (internal quotations omitted).

If the government conducts an illegal search, an aggrieved party may move to suppress the illegally obtained evidence by operation of the exclusionary rule. *See, e.g.*, *United States v. Barraza-Maldonado*, 732 F.3d 865, 867 (8th Cir. 2013). The exclusionary rule is a judicially created remedy which aims to deter future illegal searches by preventing the government from profiting from constitutional violations. *United States v. Calandra*, 414 U.S. 338, 348 (1974); *see also Mapp v. Ohio*, 367 U.S. 643, 648 (1961). More specifically, the exclusionary rule bars the government from using illegally obtained evidence in its case-in-chief against a criminal defendant. *United States v. Leon*, 468 U.S. 897, 910 (1984). Thus, if the search of a vehicle exceeds the bounds of the search incident to arrest exception, evidence obtained from that vehicle search may be suppressed under the exclusionary rule. *Gant*, 556 U.S. at 343.

**B.    Whether the January 4, 2017, Stop was Supported by Probable Cause or Reasonable Suspicion**

Jackson-Bey argues the Government failed to demonstrate it had either probable cause or reasonable suspicion to make the January 4 traffic stop because Officer Lemon's testimony about Jackson-Bey's traffic violations lacks credibility. Jackson-Bey asserts

11

Officer Lemon's testimony is unreliable for at least three reasons.  First, he argues Officer Lemon's claim that he saw Jackson-Bey roll through the stop sign as he turned onto Exchange Street lacks credibility because Officer Lemon did not immediately pull him over after supposedly observing the traffic violation.  Jackson-Bey contends Officer Lemon's explanation – that he waited because he believed it was not safe to conduct a traffic stop in the hospital drop-off area – is insufficient because he did not elaborate on how or why executing a traffic stop at that location would have been dangerous. Jackson-Bey argues the inexplicable delay in making the traffic stop casts doubt on whether Officer Lemon actually observed Jackson-Bey roll through the stop sign at all.

Jackson-Bey alternatively argues that even if a rolling stop traffic violation did occur, Officer Lemon did not have probable cause to pull over *Jackson-Bey* for rolling through the stop sign.  Jackson-Bey points out that Officer Lemon had to have lost sight of the SUV on two separate occasions before he made the traffic stop—when the SUV pulled into the hospital drop-off area, and when Officer Lemon "circled the block" to maneuver the squad car to face the hospital on Ninth Street.  At either point, Jackson-Bey contends, the driver and the passenger of the vehicle could have switched places without Officer Lemon knowing.  Thus, Officer Lemon had no way of knowing for certain whether Jackson-Bey was actually driving the vehicle at the time the alleged rolling stop traffic violation took place. Therefore, according to Jackson-Bey, Officer Lemon lacked probable cause to suspect that Jackson-Bey was the one who had committed this traffic violation.

Second,  Jackson-Bey argues that Officer Lemon's testimony regarding Jackson-Bey's purported failure to properly signal his lefthand turn before pulling out of the St. Joseph's Hospital driveway has gaps and inconsistencies that call into question his credibility.  Jackson-Bey asserts that Officer Lemon gave inconsistent accounts for how the right turn signal was deactivated before the vehicle turned onto Exchange Street from the hospital drop-off area.  At the hearing, Officer Lemon initially testified that the SUV's right turn signal turned off only when the driver turned left.  (Mot. Hr'g Tr. at 20:3-4.)  On cross-examination, however, Officer Lemon first stated that failure to signal the lefthand turn was a violation that provided a second basis for his traffic stop, but then acknowledged he had no way to know if Jackson-Bey had actually activated the left turn signal before turning onto Exchange Street.  (*Id.* at 42:8-14.)  Further, Officer Lemon's incident report had merely stated that the "vehicle then deactivated the right turn signal," and it did not identify failure to signal as a separate violation underlying the stop.  (Def.'s Ex. 2 at 6.)  Jackson-Bey also notes that Officer Lemon could not recall when he ran the license plate for the vehicle, could not explain precisely how he "circled the block" to situate the squad car on Ninth Street so that he could observe the hospital drop-off area, or how he was able to do so without losing sight of the SUV, or whether he noticed a passenger in the SUV.  According to Jackson-Bey, these gaps and inconsistencies are particularly noteworthy in light of the specific details that Officer Lemon claimed to remember about that night when he testified fourteen months later, such as where his squad car was situated when he first observed Jackson-Bey's vehicle, how the front end of the SUV "raised up" as it started heading north on St. Joseph's Lane, the length of

13

time the vehicle was in the hospital drop-off area, and whether he noticed a passenger in the right front seat as he was locking eyes with the SUV's driver. Jackson-Bey asserts that Officer Lemon's ability to remember some minute details but not others calls into question the overall accuracy of his testimony.

Third, Jackson-Bey argues that Officer Lemon's claimed observations, particularly about the actions of the SUV and its driver while in the hospital driveway, are not plausible given the location where Officer Lemon's squad car was situated. To observe the vehicle after it pulled into the hospital drop-off area, Officer Lemon maneuvered his squad car on Ninth Street to face in the direction of the hospital, at least 100 and perhaps as much as 200 feet away from the hospital driveway exit.[1] (Mot. Hr'g Tr. at 17:18-20.) From that position, Jackson-Bey asserts Officer Lemon did not have a clear vantage point to observe the vehicle because it was dark, and there were obstacles between the squad car and the driveway exit, including a car parked on the street just west of the exit and a pay kiosk for street parking. (Def.'s Ex. 3 at 2:07:40-45.) Despite the lighting, the other objects between the squad car and the SUV, the passenger in the right front seat, and the significant distance, Officer Lemon testified he made direct eye contact with the driver of the vehicle and could observe the right turn signal, as the SUV prepared to pull out from the hospital drop-off area. (Mot. Hr'g Tr. 18-20.) In short, Jackson-Bey argues, it is not credible that Officer Lemon was able to make eye contact with the driver and make

---

[1] Officer Lemon testified that the distance between the squad car and the entrence of the hospital drop-off area was 100 to 150 feet. (Mot. Hr'g Tr. at 19:12-14.) Jackson-Bey asserts the distance was more than 200 feet. (Def.'s Mem. Supp. Mot. Suppress at 13.)

nuanced observations about the activation and deactivation of the right turn signal under these conditions.

The Government argues that Jackson-Bey's attacks on Officer Lemon's credibility are insufficient to undermine the justification for the stop. First, the Government argues that Officer Lemon acted reasonably in waiting to pull the vehicle over after it rolled through the stop sign, and further notes that there is no constitutional requirement that a police office immediately stop a vehicle after observing a traffic violation. The Government also asserts that Officer Lemon's rationale for his delay in pulling over the vehicle was sound, as the layout of the drop-off prevented Officer Lemon from positioning his car correctly to make a safe and secure traffic stop. (Mot. Hr'g Tr. 17-18.) On that basis, the Government argues, Officer Lemon acted reasonably and in a manner consistent with his intent to effectuate a traffic stop when he waited for the vehicle to drive away from the hospital drop-off area before pulling it over, and the delay does not cast doubt on whether Officer Lemon had observed the rolling stop traffic violation he described. The Government also contests Jackson-Bey's assertion that Officer Lemon needed to have maintained continuous visual contact with the SUV in order to retain probable cause based on the rolling stop violation. It points out that even if Jackson-Bey and Lindsey had switched spots while it was out of view of the police, Officer Lemon still had probable cause to stop the *vehicle* because he observed the *vehicle* commit a traffic violation.

Second, the Government argues that any purported gaps or inconsistencies in Officer Lemon's testimony are either non-existent or trivial, and do not provide a

legitimate basis to discredit his claims. Minor inconsistencies in a police officer's account of events leading up to the traffic stop do not seriously undermine the police officer's credibility. *United States v. Cox*, No. 14-CR-0072 PJS/JSM, 2014 WL 2719645, at *1 (D. Minn. June 16, 2014). The Government argues that Officer Lemon's testimony about his observations of the right turn signal were generally consistent. In the police report, Officer Lemon wrote that Jackson-Bey "deactivated the right turn signal and abruptly turned left." (Def.'s Ex. 2 at 6.) At the hearing, Officer Lemon testified that "as the vehicle was moving [the signal] was on, and then as it turned [the signal] came off." (Mot. Hr'g Tr. 20:3-4.) As for Officer Lemon's testimony regarding when he ran the vehicle's plates, how he got into position to observe the vehicle in the hospital drop-off area, or whether he noticed a passenger in the vehicle, the Government responds that Officer Lemon testified he believed he made a U-turn to get into position on Ninth Street, that he believed he or his partner ran the plate at some point prior to the stop, and that he did not notice a passenger in the vehicle when he made eye contact with the driver. (Hr'g Tr. at 29, 36, and 40.) The Government asserts these are not the kinds of gaps or inconsistencies that should undermine the overall credibility of Officer Lemon's testimony.

Third, the Government asserts that Officer Lemon was not prevented from observing the vehicle from his position on Ninth Street by the obstructions Jackson-Bey claims existed on Exchange Street. On the contrary, the Government responds that Officer Lemon had a clear view down the sidewalk of Exchange Street when he observed the vehicle pull out from the hospital drop-off area. The pay kiosk and parked car that

16

Jackson-Bey asserts blocked Officer Lemon's view were on or near the street, which left a line of sight down which Officer Lemon could observe the vehicle, its driver, and the right turn signal.

After a careful review of the record, the Court finds Officer Lemon had probable cause to conduct the traffic stop based on his testimony that he observed the SUV fail to make a complete stop before it turned right from St. Joseph's Lane onto Exchange Street. The Court found Officer Lemon's testimony to what he observed at that juncture credible, and notes that there was no obstruction that would have interfered with his ability to observe the SUV's turn and whether it did or did not stop fully before turning. Further, the Court accepts as credible Officer Lemon's rationale for deciding not to stop the SUV immediately. Only moments after the turn, he witnessed the SUV pull into a hospital drop-off zone, and it is reasonable that he and his partner would have concluded such an area was not a safe or secure place to make a traffic stop. Finally, the Court rejects Jackson-Bey's argument that Officer Lemon did not have probable cause because he did not know with 100% certainty which of the two occupants of the SUV was driving at the time of the rolling stop a minute or two earlier. "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Here, Officer Lemon had probable cause to believe that whoever was driving the vehicle at the time it rolled through the stop sign a half block away from St. Joseph's Hospital had committed a traffic violation; that was sufficient probable cause to make the stop.

On the other hand, Officer Lemon did not have probable cause to believe the driver of the SUV had committed the additional violation of failing to signal his left turn before pulling out from the hospital driveway onto Exchange Street. He admitted on the stand that he could not see the left front corner of the SUV and therefore had no basis to conclude one way or the other whether the driver activated his left turn signal before he actually made the turn. Therefore, if there had been no earlier rolling stop violation, Officer Lemon could not have properly based the January 4 traffic stop on the ground that the SUV had committed a traffic violation related to turn signaling, and the police incident report of that date does not suggest otherwise.

Having determined Officer Lemon had probable cause to pull over the SUV on the basis of the observed rolling stop violation, the Court need not look for other bases that could have justified the stop. However, the Court believes it appropriate to address the concerns raised about the credibility of his account of what he did and saw after the SUV pulled into the driveway at St. Joseph's Hospital. Jackson-Bey has raised serious questions about whether Officer Lemon could have seen what he claims to have seen during that time, and argues that if Officer Lemon's testimony on that subject cannot be believed, it also raises questions about the veracity of Officer Lemon's account of the earlier rolling stop. But most if not all of these questions are based on the squad video, which suffers from significant limitations as a proxy for what Officer Lemon himself could have seen. First, the video camera in the squad pointed forward, while Officer Lemon was looking out the driver's side window. Second, it appears he was sighting down the sidewalk, while the obstacles that Jackson-Bey points out on the video are

closer to or actually on the street.  Third, the video picture is, obviously, not at full scale, and it is impossible to tell from video how the lighting in the area actually affected Officer Lemon's ability to see what he says he saw.  Fourth, while Jackson-Bey makes much of the passenger, there is no information about how far back the passenger's seat or seat back were vis a vis the driver's, and it is certainly possible that Jackson-Bey, as the driver, was leaning forward to look in both directions prior to deciding on the direction of his turn.  Thus, the video does not persuade the Court that Officer Lemon could not have seen the driver and could not have seen the SUV's right turn signal activated as he described shortly before it made its lefthand turn.

Nevertheless, the Court does find it highly improbable that Officer Lemon actually made "eye contact" with the driver of the SUV in these conditions, particularly given the distance and the external lighting that almost certainly rendered it difficult if not impossible to see what was *inside* the vehicle in any detail.  But that does not mean Officer Lemon lied to the Court about what he saw.  It is at least as possible that the combination of the right turn signal, the movement of the driver's head inside the vehicle as he prepared to turn, and the subsequent left turn, led Officer Lemon to conclude, albeit erroneously, that he must have made eye contact with the driver and that eye contact triggered the driver's decision to change direction.  Thus, while the Court discounts Officer Lemon's testimony concerning his eye contact with the driver, the Court does not find that his testimony about the earlier rolling stop violation must be discounted as well.

But, the Court does find that the January 4 stop could not have been justified on the alternative ground of reasonable suspicion that criminal activity was afoot.  Although

the Eighth Circuit gives a fair amount of latitude to police officers to make stops based in part on their perception that a vehicle's movements are "evasive," the Court is not persuaded that the movements described here – starting up "abruptly," turning onto Exchange Street, pulling into a hospital driveway for a minute or two, apparently debating which direction to go, and then turning in the direction it had been going already – are sufficient to provide the "specific and articulable facts" necessary to establish a reasonable suspicion of criminal activity that would justify a traffic stop, even when one takes into account the time of night and the reputation of the neighborhood as a high crime area.  *See Terry v. Ohio*, 392 U.S. 1, 21 (1968); *see also, Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (noting that a traffic stop is analogous to a Terry stop). Whether "locking eyes" with the driver of the SUV immediately before it turned in the opposite direction would have added enough to the totality of the circumstances to constitute reasonable suspicion is a moot point because, as noted, the Court concludes that Officer Lemon could not have done so here.

However, because the Court finds Officer Lemon had probable cause to effect a traffic stop based on his observation that the SUV committed the violation of turning without coming to a complete stop at a stop sign, the Court recommends that Jackson-Bey's motion to suppress the evidence seized as a result of that stop be denied.

### C.   Whether the April 13, 2017, Stop was Supported by Probable Cause or Reasonable Suspicion

Jackson-Bey argues that the traffic stop effectuated by Officers Gleason and Sauer on April 13, 2017, violated his constitutional rights because they did not have a legitimate

20

basis to pull him over for a traffic violation. He contends the police officers stopped him

because they merely suspected, without more, that he was selling drugs. As support,

Jackson-Bey points to the circumstances surrounding the traffic stop. Officer Gleason

testified that he and his partner were called to the area near the Dorothy Day Center on

April 13, 2017, to observe Jackson-Bey because Officers Bragg and Nayman suspected

that he was dealing drugs. (Mot. Hr'g Tr. at 48-49.) Upon arriving, Officers Gleason

and Sauer saw Jackson-Bay get into a vehicle and drive away. (*Id.* at 49-50.) They

followed Jackson-Bey in an unmarked police vehicle. (*Id.* at 52:2-7.) Officer Gleason

testified he knew from the outset that Jackson-Bey was driving on a revoked license, and

that he observed Jackson-Bey exceed the speed limit almost immediately, but the officers

did not pull over Jackson-Bey until he had traveled nearly a mile from his starting point.

(*Id.* at 50-54.)

Jackson-Bey argues that if Officer Gleason and his partner had actually observed

those traffic violations, they would not have allowed him to travel such a significant

distance before pulling him over. He also questions whether the officers could have

assessed his speed without using a radar and legitimately come to the conclusion that he

was exceeding the speed limit. What is more likely, Jackson-Bey asserts, is that the

police officers pulled him over to investigate his suspected drug dealing and then

conjured up a justification for pulling him over post-stop. On these facts, Jackson-Bey

argues the strong motivation to pull him over casts doubt on the traffic violations Officer

Gleason claims he observed before making the stop.

21

The Government counters that Officers Gleason and Sauer directly observed Jackson-Bey commit at least three traffic violations, which gave them multiple valid bases to conduct the traffic stop. First, Officer Gleason testified that he was aware of Jackson-Bey from multiple previous encounters and knew that Jackson-Bey had a suspended driver's license. Thus, as soon as he observed Jackson-Bey operate the vehicle and commit a traffic violation, Officer Gleason had probable cause to stop him. Second, Officer Gleason testified that he saw Jackson-Bey commit another traffic violation when he drove away at high rate of speed that Officer Gleason believed exceeded the 30 mph speed limit. The Government points out that, contrary to Jackson-Bey's assertion, an officer's visual estimation of speed can be sufficient to provide probable cause to conduct a traffic stop. *See United States v. Gaffney*, 789 F.3d 866, 868 (8th Cir. 2015). Third, Officer Gleason testified that he observed Jackson-Bey commit a third traffic violation when he turned from Exchange Street into the far right lane of Wabasha Street. Had he legally made the turn, Jackson-Bey would have traveled into the nearest lane of the street. Therefore, the Government asserts that Officer Gleason and his partner lawfully stopped Jackson-Bey on April 13, 2017, because they observed him make three separate traffic violations.

Based on its review of the record, the Court finds that Officer Gleason and his partner effectuated a lawful traffic stop on April 13, 2017. Even if Officer Gleason and his partner had a pretextual motive to stop Jackson-Bey for his suspected drug dealing, they did not commit a constitutional violation by stopping him so long as they had a lawful basis to do so. *Whren v. United States*, 517 U.S. 806, 812 (1996). Such is the case

even if the probable cause to make a stop arises from a minor traffic violation. *United States v. Roggeman*, 279 F.3d 573, 581 n.5 (8th Cir. 2002). The Court finds credible Officer Gleason's testimony about what he knew and observed, and finds that he had reason to believe Jackson-Bey committed three separate traffic violations, constituting probable cause to make the stop. Therefore, the Court recommends denying the motion to suppress evidence from the April 13, 2017, traffic stop.

Accordingly, based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Taariq Kaaleeq Jackson-Bey's Motion to Suppress evidence seized as a result of the January 4 and April 13, 2017, traffic stops [Doc. No. 35] be denied.

Dated: April 9, 2018                     s/ *Hildy Bowbeer*
                                  HILDY BOWBEER
                                  United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of:
(1) 14 days after the objections are filed; or (2) from the date a timely response is filed.